IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MIKAYLA P. RICHARDSON                                              PLAINTIFF

v.                                      CIVIL NO. 21-02160

KILOLO KIJAKAZI,[1] Acting Commissioner                    DEFENDANT
Social Security Administration

### MEMORANDUM OPINION

Plaintiff Mikayla P. Richardson brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claims for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## I.     Procedural Background:

Plaintiff protectively filed her applications for DIB and SSI on July 10, 2019, alleging an inability to work since May 15, 2019, due to a combination of physical and mental impairments. An administrative hearing was held on November 23, 2020, at which Plaintiff appeared with counsel and testified. (Tr. 27-60). Vocational expert Dr. Debra A. Steele, of Lightfoot Consultants, participated in the administrative hearing.

---

[1] Kilolo Kijakazi has been appointed to serve as the Acting Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

On January 11, 2021, the ALJ issued an unfavorable decision. (Tr. 8-20).  The ALJ found that during the relevant period, Plaintiff had an impairment or combination of impairments that were severe: postural orthostatic tachycardia syndrome, post-traumatic stress disorder, borderline personality disorder, depression, anxiety, anorexia, and fibromyalgia. (Tr. 13-14). However, after reviewing all evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 15–17). The ALJ then found Plaintiff retained the residual functional capacity (RFC) to:

> [P]erform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except occasional stopping and crouching, no hazards to avoid such as ladders, ropes, scaffolds, moving mechanical parts, unprotected heights, deep water, or open flames; simple routine repetitive tasks with few variables and little judgment required, supervision that is simple, direct, and concrete, and social interaction that it incidental to the work performed.  (Tr. 15) (full discussion at Tr. 15-19).

The ALJ determined that Plaintiff could perform unskilled sedentary work with limitations. (Tr. 19-20). Thus, the ALJ found Plaintiff had not been under a disability, as defined by the Act, from May 15, 2019, through the date of her decision. (Tr. 20).  The Appeals Council denied review on August 3, 2021 (Tr. 1-3), and Plaintiff filed this action on October 4, 2021. (ECF No. 1). Both have filed appeal briefs, (ECF Nos. 19, 20) and the Court carefully has reviewed both the briefing and the entire transcript. The Court makes recitations to the record only to the extent necessary to perform its required judicial review.

## II.    Evidence Presented:

A review of the medical record reflects that Plaintiff Mikayla Richardson – who is now 26 years old – was 22 years old with one child (who had been born on December 26, 2017) and pregnant with another at the time her disability onset in early May 2019. Plaintiff had most recently worked as a licensed CNA during 2018 and 2019, with prior work as a cashier, a

stocker, and a trainee in the National Guard where she was discharged following a pelvic/hip injury with hospitalization.   (Tr. 229, 349).

A.      **Cardiology Associates of North Central Arkansas**

On April 19, 2019, and by referral from her PCP, Plaintiff established care with Dr. Shuja Rasool, cardiologist at Cardiology Associates of North Central Arkansas. (Tr. 396-398). During the visit, Plaintiff reported recurrent syncopal episodes, advising her first symptom onset at age 18 while still in school with loss of consciousness but noting the episodes were then short in duration. (Tr. 397, 420). Episodes of syncope including lightheadedness, dizziness, shortness of breath, racing heart, fatigue, and flushing were all reported; these episodes increased with Plaintiff's first pregnancy, but she noted some abatement upon birth of her child. (Tr. 397, 420). During her second pregnancy, Plaintiff's syncopal episodes significantly worsened, occurring almost daily and with less warning, and sometimes causing her to pass out. (Tr. 397, 420).  She reported that walking with her infant causes fear due to a recent syncopal episode when Plaintiff fell carrying the child, resulting in a reported minor injury to the infant.  (Tr. 397, 420).  During examination, Plaintiff's blood pressure decreased from 116 to 94 with standing and her heart rate increased from 80 to 116 with standing, consistent with orthostatic hypotension. (Tr. 398, 421). Dr. Rasool ordered additional tests but counseled Plaintiff that the ordinary prescription medications to manage the hypotension should be avoided during her pregnancy, discussing instead lifestyle changes such as diet and compression stockings. (Tr. 398, 421).

Following completion of tests and on May 5, 2019, Dr. Rasool diagnosed Plaintiff with postural orthostatic tachycardia syndrome (POTS)[2]. (Tr. 394-395) Diagnosis was premised upon

---

[2] POTS is a fairly rare condition that is classified as a form of Inappropriate Sinus Tachycardia by the National Institute of Neurological Disorders and Stroke.

reported "lightheadedness, dizziness and syncope[3]" symptoms as well as chest pain recurrent since age 18 and worsened by her pregnancies; disabling syncopal episodes (including passing out) despite reported compliance with recommended POTS' lifestyle modifications; Holter Monitor data reflecting some infrequent premature ventricular contractions; review of an unremarkable echocardiogram; and a failed a tilt table test.[4]   (Tr. 394-395, 413). Dr. Rasool recommended thigh high compression socks, a high salt diet and posturing modifications, and discussed prescribing Plaintiff Midodrine upon conclusion of her second pregnancy.  (Tr. 395).

Plaintiff was seen by Dr. Rasool on August 1, 2019, complaining of chest pain that was associated with Plaintiff's Braxton-Hicks' contractions, and complaining of recurrent episodes of lightheadedness and dizziness.  (Tr. 393, 408).  Dr. Rasool again noted that after Plaintiff delivered her baby, he would consider prescribing Florinef and "medication adjustment" for treatment of POTS.  (Tr. 393, 408).

### B.      Marshall Medical Clinic & Johnson Regional Medical Center

Plaintiff had established care with PCP Dr. Roxanne Marshall on September 18, 2018. (Tr. 521).  Plaintiff advised she had had one miscarriage and one live birth, with a child who was nine (9) months old at the time of the appointment. Plaintiff denied taking any medications but reported feeling weak and tired, losing weight, suffering diffuse joint pain, and experiencing severe social anxiety with panic attacks. (Tr. 521).  Dr. Marshall ordered blood work, and prescribed Plaintiff Zoloft 25 mg, once per day for one week, and then 50 mg thereafter.  (Tr. 521).

---

[3] Syncope means "loss of consciousness and postural tone caused by diminished cerebral blood flow."  *Stedman's Medical Dictionary* 1887 (28th ed. 2006).
[4] Plaintiff's blood pressure, when tilted, improved from 96/56 mmHg to 108/61 mmHg with a heart rate that jumped from 74 beats per minute to 110 beats per minute consistent with postural orthostatic tachycardia syndrome. Plaintiff reported feeling lightheaded and dizzy, experiencing blurred vision, and feeling as if she will pass out. Dr. Rasool diagnosed clinical correlation with POTS. (Tr. 400).

Plaintiff was next seen by Dr. Marshall on November 8, 2018, primarily to discuss a negative reaction (rash) to the prescription medication Dr. Marshall prescribed to treat Plaintiff's anxiety. (Tr. 520). Plaintiff reported continued diffuse joint pain, weakness, and weight loss. (Tr. 520). Dr. Marshall indicated Plaintiff was suffering an exacerbation of her previously diagnosed fibromyalgia, lethargy with weight loss, and anxiety which is worsening these conditions; Dr. Marshall prescribed Buspar, 7.5mg, twice per day.  (Tr. 520).

Plaintiff was seen on April 7, 2019, in connection with vaginal bleeding believed to be associated with pregnancy; Plaintiff also reported that she "faints often."  (Tr. 335).  Results of Plaintiff's twenty-four (24) hour Holter Monitor on April 16, 2019, are found in the Johnson Regional Medical Center records, reflecting that Plaintiff had no syncope event during those hours.  (Tr. 343).

During her appointment with Dr. Marshall on April 16, 2019, Plaintiff described worsening syncopal episodes, reporting an almost daily occurrence of these symptoms – a fast heartbeat, dizziness, sweat, passing out and occasional accompanying chest pain. (Tr. 519). Plaintiff reported frontal headaches with photophobia, noting a history of migraines. (Tr. 519). Dr. Marshall noted that Plaintiff is seventeen (17) weeks pregnant, reporting this has been ongoing during her entire pregnancy and relating these episodes also occurred during Plaintiff's first pregnancy. (Tr. 519). Plaintiff's blood pressure is 94/52 (hypotensive), although Dr. Marshall notes it was only 96/54 prior to the current pregnancy. (Tr. 519). Dr. Marshall referred Plaintiff for cardiology evaluation of her syncopal episodes.

Plaintiff was seen by Dr. Marshall on May 14, 2019, to discuss Dr. Rasool's POTS' diagnosis.  (TR. 518).  Dr. Marshall noted that Plaintiff (still pregnant), is unable to stand at work or lift and carry things as this exacerbates her hypotensive episodes. (Tr. 518). Dr. Marshall

advised Plaintiff, whose blood pressure was 95/50 with a pulse of 100, that she would need a "training course to see if she can do some type of a desk job where she is not changing positions and stopping bending and lifting as this exacerbates er postural hypotension and tachycardia." (TR. 518).

Plaintiff, then in her third trimester of pregnancy, was seen at the Marshall Medical Clinic on September 3, 2019, reporting worsening fibromyalgia and discussing PTSD. (Tr. 517). Dr. Marshall advised she could not prescribe anything for the increased reports of pain due to Plaintiff's pregnancy and impending breastfeeding; Dr. Marshall advised that when breast-feeding ceased, she could prescribe gabapentin, Lyrica, or Cymbalta. (Tr. 517).

On September 15, 2019, Plaintiff delivered a healthy baby girl at the Johnson Regional Medical Center. (Tr. 548-555).

At an appointment on December 11, 2019, Plaintiff reported frontal headaches associated with nausea, photophobia and vomiting with frequency of 3-4 per month. (Tr. 516, 538). Dr. Marshall notes Plaintiff's recurrent syncopal episodes, as well as reports that Plaintiff is tired, has been losing weight, and is lethargic with history of iron deficiency anemia. (Tr. 516, 528). Dr. Marshall attributes lethargy to a new infant at home and complaints of pain to Plaintiff's fibromyalgia diagnosis. (Tr. 516, 538). Plaintiff is breastfeeding so she is still not a candidate for sumatriptan or Topomax.

On June 5, 2020, Plaintiff was seen at the Johnson Regional Medical Center with a migraine and was administered Toradol and promethazine. (Tr. 566-567).

Plaintiff was seen on October 9, 2020, complaining about bilateral back pain, difficulty with urination and hypotensive events when standing. (Tr. 535). Dr. Marshall ordered labs and an ultrasound of Plaintiff's kidneys. (Tr. 536). An ultrasound was conducted on October 14,

2020, at the Johnson Regional Medical Center, and Plaintiff subsequently was referred to urologist Dr. Brown. (Tr. 534).

Plaintiff's follow-up appointment with Dr. Marshall was October 19, 2020. (Tr. 533). It is reported that Plaintiff recently has ceased breastfeeding and will be following up with her cardiologist, Dr. Rasool, regarding medication for her continuing POTS symptoms. (Tr. 533). Plaintiff also complained of bilateral, upper back pain along with arm and leg pain that is described as aching. Plaintiff reports experiencing a migraine during the appointment with light and smell sensitivity, pain with positional changes and aura. (Tr. 533).  Plaintiff took Cambia while in the office with immediate relief of headache symptoms; Plaintiff was given (6) doses of Cambia and advised to return to the clinic if she suffers from more than (9) migraines during a single month. (Tr. 534). Plaintiff was prescribed Midodrine, 2.5 mg for managing symptoms of POTS and her escitalopram, 5mg was also continued.

Plaintiff was seen again by Dr. Marshall on October 30, 2020 (Tr.611-618). Plaintiff reports vision changes (blurriness) prior to migraine headaches with a migraine history (Tr. 616), but acknowledges it can be difficult for her to distinguish balance and dizziness issues as her POTS is symptomatic with standing. (Tr. 616). Plaintiff also complains of symptoms related to her fibromyalgia, including tingling and weakness which is uncomfortable and sometimes painful, sporadically, in her upper thighs, upper left shoulder, back of her left arm and hands, bilaterally. (Tr. 616). She notes lack of coordination in hands, reaching but often unable to grasp things.  (Tr. 616). Dr. Marshall ordered an MRI of the brain and spine, and an x-ray of Plaintiff's cervical spine. (Tr. 618).   The MRI, performed at Johnson Regional Medical Center was negative.  (Tr. 622).

### C.      Counseling Associates

During 2018-2020, Plaintiff received treatment for multiple mental health conditions. Records from Counseling Associates indicate that, as of October 15, 2018, Plaintiff had diagnoses of major depressive disorder, borderline personality disorder, social anxiety disorder, unspecified trauma related to prior stress, anorexia, and an unspecified cannabis related disorder. (Tr. 430-431). It appears Plaintiff regularly participated in counseling with Counseling Associates from November 2018 through December 2019, during which she engaged in cognitive behavioral therapy with numerous goals: develop healthy thinking patterns; demonstrate and apply coping skills to deal with mood and control impulsive behaviors; develop independence ("I want to be able to go to the store by myself without panicking or needing anyone with me.  I want to feel safe and believe again."); apply problem solving skills to reduce impulsive behaviors (self-harm, sabotage); improve confidence and assertive communication, and improve reframing; manage medications and improve problem-solving skills to manage decrease anxiety and depression; and acquire independent life skills such as goal setting, ADLs, and interaction in community systems. (Tr. 431-32).

On November 2, 2018, Plaintiff met with Ashely Frinkle, PLC.  (Tr. 490-492). Frinkle reported that Plaintiff's prognosis was "guarded," noting the session was spent practicing deep breathing to reduce anxiety; processing Plaintiff's difficulty in opening-up; and discussing re-framing therapy as "freeing" herself from her past.  (Tr. 492).  Plaintiff was very nervous, was fidgeting and would not make eye contact. (Tr. 491). Noting these difficulties, Frinkle asked Plaintiff to purchase a notebook to write down her thoughts.

On November 7, 2018, Plaintiff was reportedly less anxious than during the prior visit, but Frinkle spent the session working to reduce Plaintiff's "visible anxiety," and discussing

Plaintiff's prior trauma and sexual assault and how it affects her current relationships.  (T4. 487-489).  Chart notes from November 29, 2018, reflect that Plaintiff reports her family is very religious and "believes you should be able to pray yourself out of depression or mental health issues." (Tr. 500). Plaintiff reports she does not drive; is unfocused and anxious; does not go anywhere alone because she is socially anxious; cleans compulsively and has insomnia; is impulsive with her boyfriend; and is "mentally exhausted."  (Tr. 500). Plaintiff reports history of anorexia since "very young;" history of an imaginary friend; and history of fainting and shaking for unknown reasons. (Tr. 500). Plaintiff reported past (and ineffective) prescriptions for Sertraline and Buspar. (Tr. 500).

A session on December 4, 2018, was spent processing a recent depressive episode with out of character behaviors, and rehearsing ways to confront her boyfriend (who had been on-line chatting) in a productive manner. (Tr. 485-486). Plaintiff reported that her Lexapro did not seem to be helping, that she was depressed "real bad," that she had missed two days at work and had almost lost her job.  (Tr. 485).

On December 19, 2018, Frinkle worked with Plaintiff in setting boundaries, identifying maladaptive behaviors, and discussing fears related to motherhood.  Plaintiff reported that work was going better but she still has a fear of driving.  (Tr. 483).  A session on December 28, 2018, was "focused on observable anxiety and tension" with Frinkle devoting her time with Plaintiff to deep breathing, discussing the body's emotion and physical stress responses, and encouraging Plaintiff to practice the breathing and muscle relaxation several times per day. (Tr. 480).  Frinkle noted that Plaintiff appears tense and anxious and had to be reminded to breathe. (Tr. 479).

Plaintiff returned on January 9, 2019, discussing with Frinkle that she had completed her FAFSA and hoped she could return to school to obtain an LPN. (Tr. 477). Mindfulness and deep

9

breathing techniques were practiced, and healthy, small risk taking was discussed.  Prognosis was modified to "fair," but Plaintiff was counseled about missing an APRN appointment.  (Tr. 477).  Returning on January 24, 2019, the session with Frinkle was spent discussing Plaintiff's positive pregnancy test and morning sickness; the challenges of Plaintiff's current living situation; obtaining feedback from the nurse regarding her medications (weaning off Lexapro); scheduling an appointment with her OB/GYN; and identifying her support system. (Tr. 474). Prognosis reverted to "guarded."

During an appointment on February 6, 2019, Hinkle documented that Plaintiff appeared in poor hygiene, was tense, and cried during the session, expressing worries about her health and the health of her baby and reporting that she had lost ten (10) pounds due to morning sickness. (Tr. 469-471). Plaintiff was concerned about her nutrition, morning sickness, and losing her job; Plaintiff discussed a prior miscarriage. (Tr. 471). On February 2, 2019, Plaintiff described stress surrounding the ultrasound but described a good appointment with her OB/GYN.  (Tr. 466-68). Frinkle discussed stress management techniques and ways to problem solve at work without becoming verbally aggressive. (Tr. 468).

Plaintiff did not return until March 15, 2019, expressing increased stressors, anxiety, and verbal aggression. (Tr. 464-466). Frinkle described that Plaintiff was shutting down and struggling, and they discussed the urgency for Plaintiff to use cognitive and mindfulness strategies so as not to place stress on unborn child, and Frinkle reinforced the need to attend her appointments. (Tr. 466). During her next appointment on April 2, 2019, Plaintiff presented as depressed and tearful, reporting she had to "quit her job because of passing out." (Tr. 461). Plaintiff reported her blood pressure had been low, and she had been passing out several times a week and had been in contact with her PCP and OB/GYN. (Tr. 461).  Frinkle spent the

appointment with Plaintiff trying to reframe the loss of employment as an opportunity with her small child and for self-care. (Tr. 462).

Returning on April 17, 2019, Plaintiff presented wearing a heart monitor with reports about her cardiology referral and exhibiting a better mood than during her prior appointment. (Tr. 457-459). Frinkle spent the session reinforcing skills to reduce Plaintiff's depression and anxiety that diminish her ability to meet her basic needs and to improve ADLs, and to reinforce the need to eat regularly, attend doctor's appointments, and continue being assertive about her health. (Tr. 459). On April 30, 2019, Plaintiff shared that her cardiologist had diagnosed her with POTS; Plaintiff expressed she was relieved, hopeful, and grateful to have a diagnosis for symptoms Plaintiff had been unsuccessfully but consistently reporting to her parents since she was teenager. (Tr. 454-456). During her appointment on May 7, 2019, however, Plaintiff was again stressed, overwhelmed and tearful, expressing uncertainty about work since receiving her POTS diagnosis. (Tr. 451-453). Frinkle and Plaintiff role-played how to have this discussion with her PCP. (Tr. 453).

On June 3, 2019, Plaintiff reported she would not be able to move into her own home and processed her current living situation with Frinkle. (Tr. 448-450). Most of the session was spent discussing stress management to avoid an early delivery and discussing journaling (with Plaintiff expressing that her grandmother, with whom she lives, likely reads her journal). (Tr. 450). During their session on June 18, 2019, Plaintiff was again stressed and tearful, expressing that she could not continue to live with her grandmother; Frinkle spent the session practicing deep breathing to reduce "observable anxiety." (Tr. 445-447). Plaintiff expressed a need to learn how to cope with her current situation. (Tr. 447). Returning on June 25, 2019, Plaintiff indicated that she was coping better with her stressors at home and communicating better with her partner (and

the father of her children).  (Tr. 442-444).  During her appointment on July 11, 2019, Plaintiff reported that she was looking at duplexes. Plaintiff shared with Frinkle that she believed her grandfather may have molested her when she was small.  (Tr. 439-441).  When she returned on July 23, 2019, Plaintiff spent the session addressing faulty thinking, reducing impulsive urges to lash out, and evaluating ways to improve her self-esteem, focusing on effective coping mechanisms.  (Tr. 436-438).

During an appointment on August 6, 2019, with Staci Duvall, LPC, Plaintiff (accompanied by a family member in the lobby) provided details from her failed military training which included a major episode resulting in a hospitalization and several days with no memory associated with a broken pelvis; Plaintiff also discussed her history of anorexia with associated physical problems. (Tr. 433-435, 511-513).  Plaintiff reported that her POTS and constant fatigue limited her daily ability to function, but Duval noted she and Plaintiff made "positive progress w/rapport building" during their first session.  (Tr. 435).  Duval discussed Plaintiff participating in EMDR therapy with Kathleen Wallace, Ph.D., LPC as Plaintiff has a history of prior dissociations and lacks memory regarding traumatic events. (Tr. 434). During Plaintiff's appointment on August 20, 2019, Plaintiff again reported an interest in attending nursing school at ATU Ozark[5], expanded on her life story and discussed with Duval ways to resolve stressors/problems. (Tr. 430-432, 510).  Duval noted that Plaintiff's mood, confidence, and communication were improving.  (Tr. 432).

Plaintiff next saw Duvall on October 22, 2019, with her breastfeeding infant along for the appointment.  (TR. 505-507).  Plaintiff reported multiple stressors and emotional ups and downs,

---

[5] State agency consultative examiners concluded Plaintiff had returned to college at ATU, however, there is nothing contained in the record other than Plaintiff's completion of her FAFSA and her single suggestion that she is interested in returning to further her education.

including stress with boyfriend and parents, since her daughter's birth; Duvall noted that Plaintiff was regressing due to lack of treatment over several months.  (Tr. 507).

Plaintiff saw Marcia McGlone, APRN, at Counseling Associates on November 17, 2019, reporting that her baby was two (2) months old and that she has filed for disability due to POTS. (Tr. 500-504).  Plaintiff reported that her mood was low, and she had been isolating at home; she is crying, fatigued, and tired at the appointment, and reported falls. (Tr. 500). McGlone prescribed Escitalopram, 5mg. (Tr. 503).

### D.    River Valley Counseling & Therapy

Ashley Frinkle – now at River Valley Counseling & Therapy – saw Plaintiff on January 14, 2020, and completed a mental health assessment. (Tr. 585-594).  Frinkle notes Plaintiff has been diagnosed with borderline personality disorder, post-traumtic stress disorder and post-partum depression. (Tr. 583-584). Plaintiff re-established a treatment plan with Frinkle on January 21, 2020.  (Tr. 581-582).  A Medical Source Statement - Mental[6] subsequently was prepared by Frinkle on November 6, 2020, with Frinkle reaffirming Plaintiff's diagnoses of borderline personality disorder, post-traumtic stress disorder, and post-partum depression. (Tr. 577). Frinkle completed a check-box form, finding Plaintiff exhibits twelve (12) marked limitations.[7] (Tr. 577-578).

---

[6] Frinkle determined that Plaintiff's conditions would cause her to have bad days causing the need to leave work prematurely or be absent and cause Plaintiff to likely be "off task" from her symptoms that would interfere with attention and needed to perform even simple tasks 25% or more of the time. Frinkle bases these observations on her clinical findings and treatment of Plaintiff with response and prognosis.  (Tr. 577-578).

[7] The ability to carry out very short and simple instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make simple work related decisions; the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to respond appropriately to changes in the work setting; the ability to be aware of normal hazards and take appropriate precautions; and the ability to travel in unfamiliar places or use public transportation.

A Progress Summary dated November 12, 2020, from River Valley Counseling indicates that Plaintiff has been in counseling twice weekly since August 25, 2020, and has been active and compliant.  (Tr. 574).  Plaintiff's current diagnoses are borderline personality disorder and post-traumtic stress disorder which require continued therapy services. (Tr. 574).

        E.      **Access Medical Clinic**

Plaintiff saw Wanda Lewis, APRN, at Access Medical Clinic on September 14, 2020, with questions about disability paperwork. (Tr. 597-601).  Lewis declined to assist with Plaintiff's efforts to obtain disability, saying she had seen her only once on July 10, 2020, and informing Plaintiff "she was healthy" and noting "she appeared very able to work."  (Tr. 601).

**III.**      **Applicable Law:**

This court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).  We must affirm the ALJ's decision if the record contains substantial evidence to support it.  *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014).  If there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently.  *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

To determine the existence and extent of a claimant's disability, the ALJ must follow the five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education, and work experience. 20 C.F.R. §§ 404.1520, 416.920; *see also Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). The Eighth Circuit has described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*See Dixon v. Barnhart,* 353 F.2d 602, 605 (8th Cir. 2003); 20 C.F.R. § 404.1520(a)(4). The fact finder only considers Plaintiff's age, education, and work experience considering his or her residual functional capacity if the fifth stage of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

**IV.    ALJ's Analysis**

The Court finds it helpful to recap the ALJ's analysis.  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date in May 2019. (Tr. 13). The ALJ concluded at step two that Plaintiff's postural orthostatic tachycardia syndrome ("POTS"), post-traumatic stress disorder ("PTSD"), borderline personality disorder, depression, anxiety, anorexia, and fibromyalgia constituted severe impairments that "significantly limit [Plaintiff's] ability to perform basic work activities." (Tr. 13-14). In so finding, the ALJ noted Plaintiff's migraine headaches did not have more than a minimal effect on Plaintiff's ability to work as they did not occur regularly, additional testing was not sought until October 2020, and an MRI of the brain on November 24, 2020, was unremarkable.  (Tr. 14).

At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ expressly considered Listings 12.04 (Depressive, Bipolar and Related Disorders), 12.06 (Anxiety and Obsessive-Compulsive Disorders), 12.08 (Personality and Impulse-Control Disorders), 12.13 (Eating Disorders) and 12.15 (Trauma and Stressor Related Disorders), as well as 4.05 (Recurrent Arrhythmias). (Tr. 14). With respect to remembering or applying information and interacting with others, the ALJ found Plaintiff has a mild limitation and moderate limitations with respect to concentrating, persisting, or maintaining pace, and adapting or managing herself. (Tr. 15). Without at least two "marked" limitations or one "extreme" limitation, the ALJ found the Paragraph B criteria are not met, subsequently concluding the record also did not establish the Paragraph C criteria.  (Tr. 15).

Moving to step four, the ALJ found Plaintiff was unable to perform her past prior work as a CNA (Tr. 19), but that Plaintiff possessed the RFC to perform unskilled, sedentary work with

certain physical and psychological limitations. (Tr. 15-19). In reaching this decision, the ALJ generically discounted Plaintiff's evidence and statements concerning the intensity, persistence, and limiting effects of her symptoms as "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 16). A more detailed analysis of the ALJ's reasoning at step four is discussed in greater detail below.

Finally, at step five, the ALJ concluded Plaintiff could perform jobs that exist in significant numbers in the national economy, thus finding she was not disabled within the meaning of the Social Security Act. (Tr. 19-20).  The ALJ relied upon a vocational expert's testimony that an individual with Plaintiff's age, education, past relevant work experience, and RFC could work in representative occupations such as tube clerk, addressing clerk, and cutter-paster. (Tr. 19-20).

## V.    Discussion

On appeal to this Court, Plaintiff contends the ALJ failed to support the mental RFC with substantial evidence because (a) the ALJ failed to identify any evidence in support of the assessed mental RFC, and (b) the evidence of record undermines the ALJ's conclusions.  (ECF No. 19, p. 2). Plaintiff particularly contends the ALJ failed to identify medical or nonmedical evidence in support of her RFC conclusion, rendering it unsupported, unexplained, and contrary to Eighth Circuit precedent.  Plaintiff is critical of the ALJ's single paragraph discussion regarding Plaintiff's RFC which, according to Plaintiff, lacks any mention of the functional impact of Plaintiff's impairments; does not explain why Plaintiff should be limited to "supervision that is simple, direct and concrete;" does not explain any other limitation assessed by the ALJ; and "does not explain why the RFC lacks accommodations that could account for Plaintiff's panic attacks, flashbacks, or crying spells." (ECF No. 19, pp. 3-4).  Plaintiff similarly

17

complains the ALJ's assessment of the medical opinions in the record failed to include, explain, or support the assessed RFC.   Plaintiff says the ALJ addressed only the opinion of Ashley Frinkle, LPC; did not address the opinions of Dr. Margaret Podkova or Dr. Brad Williams; and despite mentioning "State agency consultants," focused exclusively on Plaintiff's physical impairments. (ECF No. 19, pp. 5-6). Considering only LPC Frinkle's opinion and then finding it "unpersuasive," Plaintiff contends the ALJ failed to support the RFC with "some medical evidence of [Plaintiff's] ability to function in the workplace as required," citing *Noerper v. Saul,* 964 F.3d 738, 744 (8th Cir. 2020). Plaintiff similarly argues the ALJ's assessment was flawed, as it omitted any examination of Frinkle's allegedly "unsupportive treatment notes" and lacked any support for the ALJ's otherwise conclusory and blanket rejection of Frinkle's opinion(s). Finally, Plaintiff contends the ALJ failed to address the nonmedical evidence of record. (ECF No. 19, p. 8).

The Commissioner unsurprisingly disagrees, citing substantial evidence supports the ALJ's determination that Plaintiff has the mental ability to perform simple, routine, repetitive tasks with few variables and little judgment with simple, direct, and concrete supervision and incidental social interaction. (ECF No. 20, p.2). Describing Plaintiff's treatment records and her therapists' opinions as "not particularly relevant to basic mental work activities," the Commissioner says the evaluations of Drs. Podkova and Williams are "more probative of the work capacity inquiry" and were persuasive because the medical evidence supports them.  (ECF No. 20, p.2).   In sum, the Commissioner argues the existing record adequately developed Plaintiff's impairments, and the ALJ properly weighted conflicting evidence to reach an informed decision as to Plaintiff's RFC. (ECF No. 20, p. 8).

Here, the Court is concerned by the ALJ's RFC analysis at step four.  A social security claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).  An RFC determination must be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations."  *Myers v. Colvin,* 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).  It is well established that a "claimant's [RFC] is a medical question" regarding "the claimant's ability to function in the workplace." *See Hensley v. Colvin,* 829 F.3d 926, 932 (8th Cir. 2016) (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)).  Nevertheless, "the RFC is a decision reserved to the agency such that it is neither delegated to medical professional nor determined exclusively based on the contents of medical records." *Noerper v. Saul,* 964 F.3d 738, 745 (8th Cir. 2020).  The ALJ's decision "may not [be] reverse[d] merely because substantial evidence also exists that would support a contrary outcome, or because [the Court] would have decided the case differently."  *David v. Apfel,* 239 F.3d 962, 966 (8th Cir. 2001).

For disability claims filed on or after March 27, 2017, an ALJ evaluates medical opinions pursuant to 20 C.F.R. § 404.1520c. These rules provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, an ALJ is to consider the persuasiveness of any opinion or prior administrative medical finding using the same five factors: (1) supportability of the opinion with relevant objective medical evidence and supporting explanations; (2) consistency with the evidence from other medical sources and nonmedical sources in the claim; (3) relationship with the claimant, including length, purpose, and extent of treatment relationship, whether it is an

examining source, and frequency of examination; (4) specialization; and (5) other relevant factors. 20 C.F.R. § 404.1520c(c). The rules, however, make clear that supportability and consistency are the "most important factors" and therefore, an ALJ must explain how she considered these factors in the decision. 20 C.F.R. § 404.1520c(b)(2).

At step four, the ALJ recites having conducted a "consideration of all of Plaintiff's symptoms and the extent to which Plaintiff's symptoms are consistent with the objective medical and other evidence" (Tr. 15), but the opinion offers little analysis and fails to incorporate Plaintiff's POTS' symptoms and related limitations in the required two-step process.  (Tr. 16). The ALJ correctly and generically summarizes cardiologist Dr. Rasool's diagnosis of Plaintiff with POTS in May 2019 but does not discuss or analyze the intensity, persistence or limiting effects of her POTS' symptoms (noted throughout the medical and counselling evidence and included within the latest medical evidence in 2020) or determine the extent to which these symptoms limited her work-related activities. The medical record is replete with Plaintiff's reports of dizziness, lightheadedness, fainting, falling and syncopal events prior to and following her POTS' diagnosis, to include specific instances and descriptions of syncope between 2018 and in the most recent post-pregnancy medical record in 2020. While Plaintiff's POTS diagnosis is referred to as "stable," there is no consideration of the symptoms one would ordinarily expect to experience with a POTS' diagnosis. During medical appointments, Plaintiff referenced daily dizziness, fainting spells, inability to drive due to fainting (and panic attacks), and even being concerned about carrying her baby while walking after report of a fall which minorly injured the infant; these are referenced in multiple state agency consultative examinations. (Tr. 67, 82, 84, 100).  Additionally, while the ALJ finds credible Dr. Marshall's opinion that Plaintiff needs a "desk job" where "she is not changing positions, and stooping, bending and lifting as this

exacerbates her postural hypotension and tachycardia," (Tr. 18), the ALJ should have engaged in a discussion of Plaintiff's POTS' symptoms and discussed any associated limitations when she fashioned Plaintiff's RFC.

Without discussion of Plaintiff's symptoms/limitations, the ALJ then gives persuasive weight to the opinion of Wanda Lewis, APRN, whose treatment notes reflect she had seen Plaintiff on a single occasion but believed Plaintiff healthy enough to work, stating that "Lewis' treatment notes support her opinion" and are consistent with those of Dr. Marshall.  (Tr. 18). Still notable in the sparse medical records from Plaintiff's encounter with APRN Lewis are multiple references to Plaintiff's ongoing and "daily" symptoms identified as "moderate syncope," dizziness, "room spinning," chest pain, shortness of breath, palpitations, and "lightheaded on standing."  (Tr. 604). Again, the ALJ appears to have parsed the Lewis records for credibility without referencing – even in passing – Plaintiff's continuing POTS' symptoms and limitations, and the Court cannot glean the ALJ's rationale which appears, to the undersigned, as "cherry-picking."  *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2020).

Plaintiff's testimony about her ADLs – particularly concerning her severe limitations resulting from POTS – is similarly discounted by the ALJ who fails to discuss or analyze how they might affect Plaintiff's work capacity. Plaintiff testified at the administrative hearing that she has "dizzy spells daily and it happens multiple times a day.  Just about every time I stand up" and typically at least 6 times per day, requiring her to rest for at least 15 minutes following an episode.  (Tr. 47-48). Finding her testimony inconsistent with the medical evidence of record, the ALJ's consideration of the *Polaski* factors is so thin it is difficult to ascertain why the ALJ believed Plaintiff's credibility was diminished; however, it seems the ALJ would have to find all of Plaintiff's testimony incredible to support the ALJ's RFC.

Similarly, the ALJ did not properly consider the VE's testimony.   The VE was posed several hypotheticals, including the following one, during the hearing:

> Q:    Let's consider hypothetical number one and assume the individual's going
> to       require some unscheduled breaks in addition to those normally allowed in
> a typical eight-hour day.  This might be due to occurring mental health symptoms
> like panic attacks or crying spells or could be resting be it the pain, fatigue, or
> dizzy spells. Let's assume this is going to happen once per day and the
> interruptions are going to be about 15 minutes.  Would such an individual be able
> to sustain competitive work over time?
>
> A:    There would be no competitive employment available.

(Tr. 58).   The ALJ's RFC opinion indicates it is "based upon the testimony of the vocation expert," but her decision does not even mention or address the above noted opinion testimony of the VE with respect to dizzy spells and related work interruptions. The RFC does not account for any potential interruption in pace or attention, or any potential need for more frequent breaks to address Plaintiff's POTS' symptoms. The Court cannot find such harmless where Plaintiff's chief physical complaint keeping her from working was POTS.

Based on the foregoing, the Court believes remand pursuant to 42 U.S.C. § 405(g) is necessary for further consideration and for the ALJ to more fully and fairly develop the record regarding Plaintiff's dizziness, lightheadedness, and syncope, and adequately explain the evidence used when determining Plaintiff's limitations in her RFC.   On remand, the ALJ is directed to address interrogatories to a medical professional requesting that said physician review Plaintiff's medical records; complete a RFC assessment regarding Plaintiff's capabilities during the time period in question, particularly related to hypotensive tachycardia and/or POTS; and give the objective basis of the opinion so that an informed decision can be made regarding Plaintiff's ability to perform basic work activities on a sustained basis.  The ALJ may also order a consultive examination in which the consultative examiner should be asked to review the

medical evidence of record; to perform examinations and any appropriate testing needed to properly diagnose Plaintiff's conditions; and to complete a medical assessment of Plaintiff's abilities to perform work related activities.  *See* 20 C.F.R. § 416.917. With this evidence, the ALJ should then re-evaluate Plaintiff's RFC and specifically list in a hypothetical to a vocational expert any limitations that are indicated in the RFC assessments and supported by the evidence.

For these reasons, the Commissioner's final decision will be reversed, and this case remanded back to the Commission for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). A separate, concurrent Judgment shall follow.

DATED this 17th day of January 2023.

*Christy Comstock*

CHRISTY COMSTOCK
U.S. MAGISTRATE JUDGE